TOWNSHIP COMMITTEE OF THE TOWNSHIP OF LAKE-
WOOD, APPELLANT, v. LAKEWOOD WATER COMPANY
AND BOARD OF PUBLIC UTILITY COMMISSIONERS,
DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW
JERSEY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted October 29, 1959—Decided November 2, 1959.

Before Judges GOLDMANN, CONFORD and HANEMAN.

*Mr. Julius Cohn,* attorney for appellant.

*Messrs. Starr, Summerill & Davis,* attorneys for respondent
Lakewood Water Company (by *Mr. Sidney P. McCord, Jr.,*
a member of the firm).

*Mr. David D. Furman,* Attorney General, attorney for
respondent Board of Public Utility Commissioners (*Mr.
Howard T. Rosen,* Deputy Attorney General, of counsel).

PER CURIAM. This is the second phase of an appeal by Lakewood Township from a decision of the Board of Public Utility Commissioners granting Lakewood Water Company an increase in sewer rates. The sole ground for appeal was that the company had not been rendering safe, proper and adequate service. In our earlier decision, *Township Committee of Lakewood v. Lakewood Water Company,* 54 *N. J. Super.* 371 (1959), we concluded we would not disturb the rates allowed. However, we remanded the matter to the Board "for further hearing to be held after the close of the 1959 spring season, to investigate and determine whether the capital improvements [represented by the water company to have been made after the rate increases were granted] have in fact been made, as well as their effectiveness. The Board will then file a supplemental report detailing its findings and making a determination as to whether the sewer service now provided is safe, proper and adequate. Upon the coming in of that report we will schedule further argument to determine whether the rates fixed are just and reasonable in the light of the service being provided."

The Board thereupon scheduled a hearing in June 1959 to determine

"(a) whether and to what extent the Petitioner, Lakewood Water Company, has since April, 1958, made the capital improvements in its sewer plant and facilities as set forth in its Petition and in the Board's Decision and Order dated June 12, 1958;

(b) the effectiveness of such improvements as may have been made; and

(c) whether the sewer service now rendered by the said petitioner is safe, proper and adequate."

Following two days of testimony the Board filed a decision wherein, after analyzing the proofs and making a number of appropriate findings, it concluded that the sewer service supplied by the company is safe, proper and adequate.

The parties have agreed that we now decide the matter without further oral argument, on the basis of the record

of the June hearings, the Board's supplemental decision, and briefs.

Our reading of the prior record and the testimony taken at the more recent hearings convinces us that the sewage overflows of which the township complained at the 1958 rate hearings were the result of an unprecedented precipitation in Lakewood during the spring of 1958, as well as the large influx of holiday visitors. There was no comparable overflow or failure of the sewerage system in the spring of 1959.

Evidence at the hearing after the remand was concerned primarily with service conditions during the spring of 1959. There was uncontroverted testimony that the company took definite steps to correct the situation soon after the 1958 Board hearings. It requested its engineering department to make a study to determine just what measures were necessary to alleviate the conditions complained of. The resulting recommendations led to a number of immediate improvements in the collecting system, at a total cost of $23,618. These included the following installations: (1) 1,815 feet of 20-inch trunk main extending from the sewage disposal plant, together with five manholes; (2) 429 feet of 12-inch collecting main in Cedar Bridge Avenue, with two manholes; (3) 997 feet of 8-inch force main in Princeton Avenue and Ninth Street; and (4) a 500-gallon-per-minute pump at the Ninth Street lift station. All these were placed in service between June 16 and November 26, 1958, and had proved effective in meeting the conditions that had existed earlier that year.

The expenditure for the described improvements form no part of the $260,000 program of improvements and additions to the disposal plant, testified to at the 1958 hearing. The primary purpose of this larger capital project is to have sewage pass through trickling rock filters rather than the present intermittent sand filters. Further study has established that the project would now cost $421,000. At the time of the latest hearing the company had already

executed a $261,693 contract for installing the new equipment, the balance representing the cost of materials and the equipment itself, all of which had been placed on order.

The proofs adduced by the township at the recent Board hearing were intended to establish that (1) during March and April 1959 sewage had backed up and overflowed at four different manholes; (2) the intermittent sand filters had been bypassed and remained out of service from December 8, 1958 to some time in May 1959; (3) one of the chain drags at the sewage disposal plant had been out of operation on two occasions; and (4) the company does not have proper maintenance procedures. It is for these reasons the township continues to claim that the company's sewerage service is not safe, proper and adequate.

The record of the June 1959 hearing contains entirely convincing testimony that stoppages of the kind testified to by the township witnesses normally occur in all sewage collection systems. Most of them are caused by customers dumping excessive amounts of paper, rags and grease into the system; in some cases tree roots work their way into the pipes. As a result, mains become clogged and sewage backs up and overflows at the manholes. This, it was testified, was the common experience; it is impossible to maintain uninterrupted service in any sewage collection system because of these stoppages, coming as they do at unexpected times and places. The company's expert witness, a sanitary engineer with impressive qualifications, testified that in his opinion the Lakewood system was safe, proper and adequate, thereby corroborating similar testimony by the company president, a man with extensive experience in the business.

In each of the four instances of overflow the cause of the stoppage appears to have been rags, paper or grease. In every case the situation was immediately remedied by company maintenance crews who, with rods and other equipment, quickly removed the offending material.

The company president readily admitted that the intermittent sand filters had been taken out of 'service during the winter of 1958-59, as they had in previous years, and this with notice to the State Department of Health. He explained that this action had to be taken because adverse weather conditions did not allow a sufficient period of time to dry out the sand used in the filters. The only effect of bypassing the filters was that the effluent discharge from the disposal plant into the Metedeconk River had a somewhat higher turbidity—there was a higher incidence of fine material suspended in the liquid. The bacterial count in the effluent was about the same—almost zero—because of the use of more chlorine. It was precisely in order to prevent any further bypassing of the filters that the company had undertaken the extensive program of improvements and additions to its disposal plant that would insure maintenance of uninterrupted secondary sewage treatment. Neither the previous estimate of $260,000 for this project, nor the revised figure of $421,000, is in any way included in the rate base involved in the present proceedings.

The township also produced a witness who testified that in September and October 1958 a link belt chain drag at the disposal plant was not in operation. It presented no evidence to show that this resulted in unsafe or inadequate service. The company explained that it had two mechanical mixing and coagulating basins, each of which has a chain drive which drags the sludge or heavy material to a pit. Two basins are utilized, so that if the mechanical equipment in one breaks down, the other is available as a substitute. Both are in operation during peak periods; in a period of low flow it is often necessary to take one basin out of service for technical reasons. Service is in no way affected by shutting off one of the chain drives.

As for the complaint that the company did not carry on proper maintenance procedures, the uncontradicted testimony was that every manhole in the system was checked at least once a year, on a periodic basis. Approximately

once every six months maintenance crews check "strategic" locations—places where fairly large quantities of sewage enter the collection system. Where there are known conditions that lend themselves to the entrance of roots, rags and grease into the system, inspections are conducted once every month or two months. The township claims that this program of inspection and maintenance is not enough; the company's experts testified to the contrary.

When this case was last before us we observed that the duty of a public utility to provide safe, proper and adequate service is an element which the Board must take into consideration in determining what is a just and reasonable rate of return. The Board may exercise great flexibility in passing upon utility rates, and it has often been said that there is a presumption in favor of the correctness and validity of its action. 54 *N. J. Super.* at *page* 378. We also said:

"\* \* \* On judicial review this court will not substitute its independent judgment for that of the Board, but will confine its inquiry to the ascertainment of whether the evidence furnished a reasonable basis for its action. *In re Greenville Bus Co.*, 17 *N. J.* 131, 137–138 (1954). It is our duty to weigh the evidence under the pertinent legal principles and determine whether the issue of granting the utility a just and reasonable rate of return has been properly considered and decided. *In re N. J. Power & Light Co.*, 9 *N. J.* 498, 508 (1952)." (54 *N. J. Super.* at *page* 382)

We find that the testimony adduced at the hearing on remand furnishes an entirely reasonable basis for the action taken by the Board. The matters now complained of by the township, weighed in the balance of all the testimony, do not call for a conclusion that the sewage service provided by the company is not safe, proper and adequate. The conclusion reached by the Board is supported by substantial evidence. We see no occasion to disturb it.

Affirmed.